STATE of Missouri, Respondent,

v.

Donald Lee KELLY, Appellant.

No. 59298.

Supreme Court of Missouri,
En Banc.

July 12, 1976.

Ronald M. Sokol, Public Defender, Joe H. Scott, Asst. Public Defender, St. Joseph, for appellant.

John C. Danforth, Atty. Gen., by Paul R. Otto, Asst. Atty. Gen., for respondent.

HOLMAN, Judge.

Appellant, Donald Lee Kelly (hereinafter referred to as defendant), was charged with the offense of robbery in the first degree. See Sections 560.120 and 560.135, RSMo 1969 V.A.M.S. Upon trial he was found guilty. The jury being unable to agree on punishment such was fixed by the trial judge at imprisonment for a term of 40 years. Defendant appealed to the Kansas City District of the Court of Appeals. That court adopted an opinion which reversed

the judgment and remanded the case for a new trial. Upon application of respondent we ordered the case transferred to this court. It will be finally determined here the same as on original appeal. Art. V, Sec. 10, Mo.Const. We affirm.

Since defendant makes the contention upon this appeal that the evidence was insufficient to support the conviction we will state the facts in some detail. Mary Reinert and Juanita Smith were sharing an apartment in St. Joseph, Missouri, on December 26, 1973. They both worked as nurses at a nearby hospital. At 3:10 a. m. on that date, Mary was awakened by a loud noise coming from the direction of the front door of their apartment. After calling to Juanita, who was asleep in a nearby bedroom, and ascertaining that she did not make the noise, Mary went into the living room to investigate. She saw a man in the living room and was immediately struck upon the head and knocked to the floor. The man then hit her repeatedly with some sort of stick or other instrument. Juanita also came into the living room and was beaten repeatedly by the assailant. It was stipulated by the parties that both Miss Reinert and Miss Smith "took terrific beatings on the head and upper portions of their bodies." After the beatings had continued for a time, Miss Smith stated, "My God, if it is money you want, quit beating us. We will give it to you." The assailant then took the women to the bedrooms and obtained their purses. After he left it was determined that he had taken approximately $26 from the purse of Miss Reinert and also a red plastic case which contained a religious medal and a silver dollar. Seventy-five dollars was taken from Miss Smith's purse.

Because of the insufficient light and blood that accumulated in the eyes of the victims, they were not able to identify the defendant at the trial and provided police with only a general description of their attacker. They stated that he was a black male with a goatee and was approximately 5'7" tall and weighed somewhere between 140 and 165 pounds. They stated that he had on a dark colored jacket. When the police arrived, they found that the intruder had entered the apartment by breaking the glass in the front door. The two women were sent to the hospital where they were treated, operated upon, and confined for a considerable length of time. Miss Smith was not able to return to work for more than three months.

At 3:55 o'clock on that morning defendant awakened Wayne Wilson at the home of Pat Jennings where Wayne was staying with his girl friend, Sally Painter. When Wayne let defendant into the house, he saw that defendant was wearing a brown corduroy coat which was covered with blood. Defendant told Wayne that two men had jumped on him. At that time, defendant also showed Wilson a roll of bills, and they then went into a bedroom occupied by Sally Painter and defendant showed them a red case which contained a silver dollar and a religious medal. Defendant spent the remainder of the night in the next bedroom and at about 8:00 a. m. Sally observed him tearing up his corduroy coat. He had also been observed sleeping in that bedroom by Pat Jennings.

On December 28 the police found two pieces of a partially burned brown corduroy coat, which were spotted with blood, in the trash can located in the back yard of the home of defendant's mother which was not far from the Pat Jennings' house. There was evidence that blood tests revealed that the blood stains on the coat were of the same type as Miss Reinert's blood, and that a hair sample found on the coat was within the limits of variance to the hair of Juanita.

As a result of information obtained from the victims, who also viewed some photographs, a number of Negro males were questioned by the police. These included defendant and Wayne Wilson. In questioning Wayne Wilson the police obtained the information heretofore stated.

The defense of the defendant was based upon alibi and also upon the contention that Wayne Wilson was the guilty person. In his testimony, defendant denied any guilt. Defendant testified that he had shaved off

his goatee on Christmas morning; that he had stayed home all that day but had gone to a tavern where his half-brother worked at about 8:30 p. m.; that he stayed at the tavern until it closed about 1:30 a. m. and left with his brother, Stanford Davis, and after visiting with him across the street for a short time went on home. He further testified that he was intoxicated when he left the tavern; that he is 5'5" tall and weighed 130 pounds; that Wayne Wilson is his cousin; that the only corduroy coat he owned was at Leron May's house at the time in question; that on the night here involved, he had worn a white trench coat; that his father and mother were both ill and he did not think they were able to appear at the trial. Other evidence may be stated in connection with some of the points briefed.

■ The first point briefed is that the evidence does not support the verdict because the money was taken with the consent of the owners. This point is so utterly devoid of merit that it hardly warrants discussion. It is obvious that the suggestion that defendant take the money was made in order to get him to stop the beatings. It is also reasonable to assume that the victims were acting under the belief that if defendant did not get the money he would again commence beating them. Under these circumstances the jury could reasonably find that the taking was accomplished by putting the victims "in fear of immediate injury to their person and by violence to their persons" as alleged in the information. *State v. Stephens,* 66 Ariz. 219, 186 P.2d 346[4] (1947). The case cited by defendant, *State v. Wright,* 337 Mo. 441, 85 S.W.2d 7 (1935) is clearly distinguishable because in that case there was evidence that the victim invited the robbery as a part of a plot to defraud his insurance company.

■ The second point in defendant's brief is that "the evidence in the cause only circumstantially implicates appellant as the perpetrator of the crime, fails to do so beyond a reasonable doubt as a matter of law, and fails to exclude the reasonable theory of innocence that Wayne Wilson was

the perpetrator of the crime and attempted to shift the blame therefor to appellant." This contention is primarily a challenge to the weight of the evidence and the credibility of the State's witnesses, Wayne Wilson and Sally Painter. The defendant appears to ignore certain well established rules of law that require a decision contrary to his contention. As stated in *State v. Johnson,* 510 S.W.2d 485, 487 (Mo.App.1974), "In determining the sufficiency of the evidence in a criminal case after a verdict of guilty, we accept as true all evidence in the record tending to prove the defendant guilty, whether such evidence is circumstantial or direct in nature, together with all favorable inferences that can reasonably be drawn therefrom. *State v. Simmons,* 494 S.W.2d 302, 303 (Mo.1973); *State v. Reed,* 453 S.W.2d 946, 949 (Mo.1970). It is not the function of this court to weigh the evidence; our review is limited to determining whether there was sufficient evidence from which reasonable persons could have found defendant guilty as charged." When the evidence in the case before us is viewed in light of the quoted principles there can be no doubt but that a submissible case was made.

■ The next contention of defendant is that the court erred in admitting in evidence the partially burned pieces of a corduroy coat. The objection seems to be that the exhibit was not properly identified since it was not shown to the victims nor to Wayne Wilson or Sally Painter. It should be noted, however, that the pieces were similar to the bloody coat described by Wayne and Sally which defendant was wearing a short time after the robbery. Also, the evidence indicated that defendant had been seen tearing up his coat the morning of the robbery and these pieces were found in the garbage can on his mother's property a short distance away. Moreover, the blood on the exhibit was of the same type as that of one of the victims and a hair found on it was similar to the hair characteristics of the other victim. All these facts and circumstances tend to indicate that the pieces were a part of the coat worn by

defendant on the morning of the robbery. Those facts would make the exhibit relevant because it would tend to connect defendant with the offense. This court has held that the identification of an exhibit need not be wholly unqualified in order to make it admissible. See *State v. Kern,* 447 S.W.2d 571[3, 4] (Mo.1969). We have concluded that this exhibit was sufficiently identified and shown to be relevant in connecting defendant with the offense and hence was properly admitted.

■ Defendant also claims that the rulings of the trial court unduly limited his cross-examination of Wayne Wilson. An objection was sustained to this question: "Mr. Wilson, did you make a rather large purchase within the recent past?" The offer of proof was that he was attempting to impeach the credibility of the State's witness by showing that he in fact has had large sums of money in the recent past with no honest means of coming by that money.

We rule that the court properly sustained an objection to the offer. It did not give any details and was not sufficiently specific to demonstrate any relevancy. Apparently defendant was attempting to cast suspicion upon Wilson as having been the robber. Such evidence is not admissible on that theory without proof that Wilson committed some act directly connecting him with the crime. Since there was no such proof the trial court ruled correctly in excluding the proffered testimony. *State v. Umfrees,* 433 S.W.2d 284[1, 4] (Mo.1968).

■ The court also sustained an objection to an offer of defendant to show by Wilson that he and Sally were living together in a common law husband and wife relationship. Defendant says such was error because that evidence would have impeached Sally's credibility. It is said that she would testify against defendant in order to protect Wilson whom defendant argues committed the crime. In the absence of evidence directly connecting Wilson with the crime this testimony was properly excluded. Moreover, the defendant was not prejudiced by this ruling because other evidence of that nature was admitted. Wilson testified that he

and Sally were occupying the same bedroom on the night of the robbery and Sally's mother testified that Wilson and Sally were "supposed to get married."

■ Defendant next contends that the court erred in admitting the testimony of Gary Howell of the Regional Crime Laboratory relating to the comparison of blood and hair samples taken from Exhibit 7 with certain other samples submitted to him. Our examination of the transcript indicates that the testimony complained of was admitted without objection and we accordingly rule that the alleged error was not preserved for appellate review. *State v. Simmons,* 500 S.W.2d 325[2, 3] (Mo.App.1973).

■ Sally Painter testified that the silver dollar defendant showed her on the morning of the robbery had a date on it of either 1819 or 1829. In an effort to impeach her testimony defendant produced Coin Collector's Handbook by Fred Reinfeld and asked that the court take judicial notice of its contents which allegedly stated that no silver dollars were minted during the years in question. In refusing to take such notice the judge stated, "I know nothing about it." Defendant claims that the court erred in so ruling.

We have concluded that said ruling was not erroneous. The book itself was not offered so the only question relates to judicial notice. There was no proof concerning the qualifications of the author nor as to the general acceptance of the book by the public. Certainly, this is not a matter within the general knowledge of the country. Moreover, ". . . the doctrine of judicial notice is not a hard and fast one but is one which must be tempered by judicial discretion, the Court not being bound to take judicial notice of matters of fact; and whether they will do so or not being dependent on the nature of the subject, the issue involved and the justice of the case. *City of St. Louis v. Niehaus,* 236 Mo. 8, 139 S.W. 450. . . . 'This power is to be exercised by courts with caution. . . .'" *Schilling v. Bi-State Development Agency,* 414 S.W.2d 818, 826 (Mo.App.1967).

Defendant has cited cases such as *State v. Graham*, 322 S.W.2d 188 (Mo.App.1959); *State v. Gantt*, 504 S.W.2d 295 (Mo.App. 1973) and *State v. Biven*, 151 S.W.2d 1114 (Mo.1941). These cases are readily distinguishable as they present various situations where the court has taken judicial notice of well known facts but none of them represent a situation where the court *refused* to take notice and such was held error. As indicated, this point is ruled adversely to defendant.

■ Next it is contended by defendant that the trial court erred in refusing his request that a hearing be held to determine the voluntariness of a statement made by defendant to an officer which was offered by the State as rebuttal testimony. We have concluded that the ruling of the court did not constitute prejudicial error.

Defendant testified that on the night in question he stayed at the tavern and was with his brother until about 1:45 a. m. or perhaps a little later and then he went home. On cross-examination he testified, without objection, as follows:

Q Now, you were questioned by the police in relationship to this case, were you not?

A Yes, I was.

Q And did you tell any member of the St. Joseph Police Department where you were staying on the early morning hours of December 26th of last year '73?

A Yes, I did.

Q Who did you tell?

A I told Leo Schott.

Leo Schott was offered by the State as a rebuttal witness. He testified that he interviewed defendant and first advised him of his constitutional rights. At that time defendant requested the voluntariness hearing which was denied. The officer then testified to the following:

Q Mr. Schott, did the defendant Donald Lee Kelly make any statements to you concerning his whereabouts on the morning hours of the 26th of December, '73?

A Yes.

Q All right. Can you tell us what the defendant told you about his whereabouts?

A Yes. I'm not sure which time it was, whether it was on the 26th or the morning of the 28th. He talked very little in regards to this, but he did mention that he was with a Stanford Davis some time after the tavern had closed on Messanie Street.

Q Detective Schott, did he make any other statements to you about his whereabouts?

A No; nothing specific at all that I can recall.

It should be noted at the outset that there is no contention that defendant in any manner confessed to this crime. The statement offered was intended by the State to negatively contradict defendant's testimony. In other words, the State was attempting to show that defendant did not tell the officer all that he testified to at the trial. In that connection, we call attention to Section 546.260 V.A.M.S. which provides that a defendant may elect to testify but "shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case; . . . ." It should also be noted that at no time during the trial nor even in this court on appeal has defendant asserted that the statement to the officer was not voluntary.

We have the view that the request for a hearing came too late. As heretofore noted, the State, in its cross-examination of defendant, asked him specifically about his being questioned by Officer Schott and, without any objection or request for a voluntariness hearing, defendant was permitted to testify as to the statement made at that time. If defendant considered the statement involuntary he should have requested a hearing then. He cannot permit his testimony to come in without objection, and then when a later effort is made to impeach same, request a hearing on the question of voluntariness. For analogous situations see *State v. Henderson*, 510

S.W.2d 813[14] (Mo.App.1974) and *State v. Simmons*, [2, 6], supra.

Additionally, we have concluded that the statement in question was not prejudicial to defendant. In endeavoring to lay a foundation for the impeachment the State had defendant testify that he told Officer Schott where he was staying on the early morning hours of December 26th. The impeaching testimony was that he told Schott that he was with his brother sometime after the tavern closed. When asked if defendant made any other statement concerning his whereabouts the officer answered, "No; nothing specific at all that I can recall." The first part of the impeaching testimony is clearly consistent with defendant's testimony and the second part is not actually inconsistent. Defendant had not been asked if he told the officer that he went home after leaving his brother nor was there any clear indication as what span of time was included in the phrase "early morning hours." Such would not necessarily include the period following the time defendant left his brother. It should also be noted that the officer's testimony about any additional statement was indefinite and rather equivocal.

For the reasons indicated we rule that the failure to hold the requested hearing did not constitute prejudicial or reversible error.

██ Defendant also contends that the court erred in admitting the impeaching testimony of Officer Schott because no proper foundation was laid therefor. "It is, of course, well settled that when a witness has testified to a material fact it is proper to admit evidence that he has previously made a statement relating to that fact which is inconsistent with his present testimony. A foundation must first be laid by asking the witness on cross-examination if he made the statement, and obtaining either a denial or an answer that he failed to remember it." *State v. Vaughn*, 501 S.W.2d 839, 842 (Mo.1973). In this instance, on cross-examination, defendant's attention was called to the matter and he admitted having the conversation with the officer

although we have the view that the foundation question was not as specific as it should have been. However, we have heretofore held that Officer Schott's testimony did not constitute prejudicial or reversible error and for that reason this contention is overruled.

Defendant presented as a witness Stanford Davis who testified that defendant came to the tavern at 11:00 a. m. on December 25, and remained there until about 1:45 a. m. on December 26. In rebuttal the State called Officer Pasley who testified that he had a telephone conversation with Stanford on December 28 and that Stanford stated that he hadn't seen defendant in a long time. The court overruled defendant's objection that the statement was hearsay and it is here contended that the ruling was erroneous because no foundation for impeachment was laid. We agree that the ruling was erroneous because of the failure of the State to ask Stanford about the conversation on cross-examination but we have the view that such did not constitute prejudicial or reversible error. In the first place the phrase "long time" is relative and might mean two days or two years. Also, Stanford's testimony had already been contradicted by defendant's testimony in that Stanford had stated that defendant came to the tavern on the 25th at 11:00 a. m. and was there the remainder of the day while defendant testified that he did not go to the tavern until 8:30 p. m. on that day. Furthermore, Stanford's testimony did not provide any alibi for defendant as he stated that they parted at 1:45 a. m. or very shortly thereafter and the crime was committed at 3:10 a. m. There was really no controversy concerning the fact that defendant was at the tavern until it closed about 1:45 a. m. As indicated, we rule that this point does not warrant a reversal of the judgment.

██ Defendant also contends that he was denied a fair trial by the cumulative effect of the misquotations of evidence by the State during its argument and the State's references to facts adduced in rebuttal as probative of its case in chief. In

examining the motion for new trial we find that this point is complained of therein in the following manner:

"11. The Court erred in overruling defendant's objections to misquotations of evidence by the State in its argument.

"12. Defendant was denied a fair trial by the cumulative effect of the distortions of evidence, and improper arguments of, the State." Rule 27.20(a) provides that the specific grounds or causes for which a new trial is sought must be set forth in the motion in detail and with particularity. The assignments in question are too general and are not sufficient to meet the requirements of the rule. They do not specify the portions of the argument claimed to be improper nor develop in what manner they caused defendant to be prejudiced. We rule that they failed to preserve anything for appellate review. See *State v. Mathews*, 328 S.W.2d 642[5] (Mo.1959) and *State v. Cooley*, 387 S.W.2d 544[6] (Mo.1965).

The final contention is that the court erred in giving Instruction 5A at the time of submitting the case to the jury. That instruction reads as follows:

"If you unanimously find the defendant guilty you should fix his punishment. If, however, after due deliberation, you find the defendant guilty but are unable to agree upon his punishment, you will complete the verdict form so stating, and in that event the Court will fix the punishment.

"You must bear in mind that under the law it is the primary duty and responsibility of the jury to determine whether the defendant is guilty or not guilty, and if he is guilty to fix the punishment."

This contention is obviously without merit. It was settled in *State v. Brown*, 443 S.W.2d 805[7] (Mo.1969) that the giving of that instruction at the time the judge charges the jury is permissible.

Judgment affirmed.

MORGAN, HENLEY, and FINCH, JJ., concur.

DONNELLY, J., concurs in result.

SEILER, C. J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in separate dissenting opinion of SEILER, C. J.

SEILER, Chief Justice (dissenting).

I respectfully dissent. I agree with the court of appeals, Kansas City district, in the opinion written by Dixon, J., that the trial court erred in denying defendant's request for a hearing on the issue of voluntariness of defendant's statement to a police officer offered to impeach defendant's testimony.

As the court of appeals said, the facts bearing on this issue may be concisely stated. On direct examination, defendant described his activities on the night of the robbery, saying he was in a tavern and went home soon after it closed. The robbery occurred in the early morning about one and three-fourths hours after the tavern closed and therefore about one and one-half hours after defendant said he went home. On cross-examination, defendant said he told Officer Schott of his whereabouts and activities in the early morning hours after the tavern closed. The state called Officer Schott who testified in partial corroboration of defendant's testimony, but who, on the vital issue, testified he did not recall defendant telling him where he went in those early morning hours. Thus, the actual impeachment consists of a denial that the defendant made the statement he claims to have made which was exculpatory and consistent with defendant's testimony at trial.

The state treats this as if a prior inconsistent statement were in dispute, contending the issue is whether "a statement of a criminal defendant [is] admissible, without a hearing as to its voluntariness, when it is to be introduced as a prior inconsistent statement for the purpose of impeaching the defendant on a matter directly bearing on his guilt . . ."

The general rule in Missouri is that the state must prove the voluntariness of statements by a criminal defendant if it introduces the statements into evidence. *State*

*v. Monteer,* 467 S.W.2d 48, 51 (Mo. banc 1971); *State v. Thompson,* 465 S.W.2d 590 (Mo.1971); *State v. Auger,* 434 S.W.2d 1 (Mo.1968). I see no reason why the state should be permitted to use prior statements of the defendant in rebuttal without first establishing their voluntariness any more than it can use prior statements of the defendant as a part of the main case of the state against defendant without first establishing voluntariness. Both are being used against the defendant, and if an involuntary confession is to be rejected as evidence because it is considered testimonially unreliable and untrustworthy, *State v. Ussery,* 357 Mo. 414, 208 S.W.2d 245 (1948), the same would be true of involuntary rebuttal statements. Although the majority opinion states that defendant has at no time asserted that the statement to the officer was not voluntary, the opposite seems to me to be the case, because defendant did bring voluntariness into question by objecting to the admission of the testimony of the police officer and by requesting the hearing. The request was overruled, but defendant did all that could be done to raise the issue. Once the issue is raised, the reliability and, thus, the admissibility of the evidence is in doubt and the burden of proof of voluntariness is upon the state, *State v. Hunter,* 456 S.W.2d 314 (Mo.1970); *State v. Garrett,* 510 S.W.2d 853 (Mo.App.1974).

I do not see how § 546.260, RSMo 1969, the statute referred to in the principal opinion, meets this issue. The statute simply restates the common notion that if a defendant takes the stand on his own behalf, the state may cross-examine and attempt to impeach him. The statute does not authorize impeachment which would violate defendant's right to a fair trial. There can be no fair trial where unreliable evidence is introduced.

The majority opinion takes the position that the request for a hearing came too late, that defendant had already waived any question of voluntariness by not asking for a hearing when he was cross-examined about what he told Officer Schott. No one, either in the court of appeals, or in this court, or among counsel on either side, has been able to find a case closely in point, but the majority opinion refers to *State v. Henderson,* 510 S.W.2d 813[4] (Mo.App.1974) and *State v. Simmons,* 494 S.W.2d 302[2, 6] (Mo.1973) as being analogous situations. The Henderson case involved waiver of the right not to have the police testify as to defendant's refusal to permit a search of his bedroom and the *Simmons* case involved waiver by failure to object to an improper question until after the answer was given. The doctrine of waiver, of course, runs all through the law and is found in criminal as well as in civil cases. But it is universally held that for waiver to exist there must be an intentional or voluntary relinquishment of a known right or conduct such as warrants an inference of the relinquishment of a known right. 92 C.J.S. Waiver p. 1041.

In the case before us I do not believe it follows from defendant's having testified on cross-examination without objection to what he said he told Officer Schott that defendant thereby conceded the voluntariness of whatever statement Officer Schott might attribute to him. Defendant, of course, knew what he claimed he told Schott and knew that it was exculpatory. Obviously he considered it voluntary. Defendant, however, had no way of knowing what Schott was going to testify that defendant said or did not say. At this stage of the trial, defendant's guilt or innocence had not yet been determined. He was still clothed with the presumption of innocence. It remained to be decided whether what defendant said or what Schott said was to be believed. It seems to me that defendant's own testimony on cross-examination amounts to no more than an assertion of the reliability of what defendant said he told Schott; I see no implied or concurrent vouching thereby on the part of the defendant for the reliability or voluntariness of what Schott said defendant said, nor do I see any waiver thereby on the part of defendant as to the question of voluntariness of a statement which is to be attributed to him by Officer Schott (not testified to by defendant himself) and which clearly is going to be radically different from what

defendant testified to, as it is being offered against defendant by the state. Because defendant testifies to facts A, B, and C, it does not follow that defendant thereby waives the question of voluntariness of an admission or inconsistent statement attributed to him by another witness who testifies that defendant did not say A, B, and C, but instead said X, Y, and Z, facts completely opposite. If, as I maintain, defendant in the case before us did not waive the question of voluntariness of the alleged rebuttal statement used against him, then there should have been a hearing on the voluntariness of the statement and a finding by the court that it was voluntary, if so, before it was heard by the jury. We should not be less careful that statements used in rebuttal are voluntary than we are that statements used against defendant as a part of the state's direct case are voluntary. Oftentimes, rebuttal testimony is critical to the outcome of a particular case.

I gather from the fact that the principal opinion relies upon waiver that in the absence of such waiver there would have to be a hearing on voluntariness of the statement purportedly made by defendant to the police and sought to be used against him in rebuttal. As said, I do not find any waiver on the part of defendant in this case. Actually, even had defendant asked for a hearing on voluntariness at the time the question was first put to him on cross-examination about what he said to the officers, it would have established voluntariness only as to what it was that defendant said he told officers and there was really no dispute as to the voluntariness of this. I do not see how it could have established voluntariness with respect to a statement which was not what defendant said that he said and was in fact contrary thereto. It seems to me that even if there had been a hearing as to voluntariness before defendant testified on cross-examination, it would still be necessary to have another hearing when the state was about to show, allegedly from defendant's mouth a contrary statement, and, if so, I am unable to see any waiver in not asking for a hearing earlier in the case. In fact, the first hearing would be largely a

waste of time, as it would not disclose anything as to voluntariness of a statement not then before the court and which unless the state later offered it, might never be before the court. It seems to me, therefore, that the defendant's request for a hearing was timely and came at the logical place in the trial. I would reverse and remand.